Certiorari Denied April 6, 2017, No. S-1-SC-36346

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2017-NMCA-039**

**Filing Date: February 14, 2017**

**Docket No. 34,375**

**STATE OF NEW MEXICO,**

　　**Plaintiff-Appellee,**

**v.**

**NOE JIMENEZ,**

　　**Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Fernando R. Macias, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Jane A. Bernstein, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**HANISEE, Judge.**

**{1}** Defendant, a self-represented litigant who was assisted by standby counsel at trial, was charged with and convicted of being a felon in possession of a firearm in violation of NMSA 1978, Section 30-7-16 (2001), and resisting, evading, or obstructing an officer in violation of NMSA 1978, Section 30-22-1(B) (1981). Defendant appeals both convictions

1

and proffers myriad arguments to support reversal. He asserts: (1) his Sixth Amendment right under the United States Constitution to confront witnesses was violated, (2) the State failed to present sufficient evidence to sustain his convictions, (3) the district court committed fundamental error when it failed to properly instruct the jury on the relevant law for constructive possession, (4) the district court erred when it allowed the State to introduce evidence of Defendant's pending civil lawsuit against the City of Las Cruces, and (5) the State committed prosecutorial misconduct. We affirm in part, reverse in part, and remand for resentencing in accordance with this opinion.

**BACKGROUND**

**{2}** On February 25, 2012, Defendant went to the Arid Club in Las Cruces, New Mexico. The Arid Club is a place where Alcoholics Anonymous and Narcotics Anonymous meetings are held. Defendant was a member of the Arid Club and went to the club that day because he was having a bad day and wanted to talk to someone. Defendant donned a black bandana, a black shirt, Army pants, biker boots, and a bulletproof vest which was worn underneath his shirt. According to Defendant, this was his normal attire except for the bulletproof vest, which he wore that day because he felt his life was in danger. Defendant was also carrying nunchucks.

**{3}** Only three people were at the Arid Club when Defendant arrived. One was Brandon Chandler, a volunteer at the club who was running the snack bar that day. Another was someone who identified himself to police as Chandler's case manager. The third person was never identified in the record. At some point after Defendant had entered the Arid Club, the Las Cruces Police Department responded to a call at the club. It is unclear exactly who called the police, what was reported, and to what kind of incident police believed they were responding.

**{4}** Wallace Downs, a detective with the Las Cruces Police Department at the time of the incident, testified at trial that he went to the Arid Club in response to a call from another officer, Sergeant Ronnie Navarrete, who had been "flagged down" at the club. After briefly speaking with Sergeant Navarrete, who did not testify at trial, Detective Downs began interviewing people at the scene to try to determine if there were any witnesses who could describe what was going on inside the club. Detective Downs spoke with the person who identified himself as Chandler's case manager. The case manager said he had a phone number for Chandler, with whom Detective Downs was then able to make telephonic contact.

**{5}** According to Detective Downs, Chandler "was talking very low as if he were scared or concerned." There was conflicting testimony regarding whether Chandler was being held against his will inside the Arid Club, but Detective Downs testified that Chandler told him that there was a person inside with a gun and that he did not think he could leave. Defendant testified that Chandler was free to leave at any time. Everyone agreed that once Chandler gave Defendant the phone and Detective Downs asked Defendant to let Chandler leave the

2

club, Chandler walked out within minutes.[1]

**{6}** Detective Downs spent approximately one hour on the phone with Defendant, first building a rapport with him and then asking that Defendant surrender to police. Defendant stated that he was armed with a gun, did not want to "go on . . . living," and wanted to have the police shoot him. Detective Downs requested at least three to five times that Defendant put down his weapon and come out with his hands up to surrender to police. Detective Downs recalled that Defendant agreed to surrender a couple of times but never did. Eventually, the call ended because the battery in the phone Defendant was using died.

**{7}** Soon after, a tactical team that had assembled on scene, consisting of SWAT officers and a K-9 unit, entered the Arid Club and apprehended Defendant. According to Joshua Savage, an officer assigned to the Las Cruces Police Department's K-9 unit, Defendant did not immediately surrender, and application of force was necessary to bring him into custody.

**{8}** Following Defendant's arrest, police searched the Arid Club and obtained a search warrant for the car that Defendant drove there. Inside the club, police recovered a gun that contained six bullets, two of which were live rounds, and a bullet on the floor. Another forty-five rounds of ammunition were located in a bag found inside the vehicle driven by Defendant.

**{9}** Defendant appeals both counts of conviction. Additional facts are provided as necessary to our discussion.

**DISCUSSION**

**{10}** First we take up the ammunition's admissibility, which hinges on Defendant's Confrontation Clause argument, then discuss whether there was sufficient evidence to support Defendant's convictions. Next, we address whether the district court erred in instructing the jury and allowing evidence of Defendant's pending lawsuit against the City of Las Cruces before turning to Defendant's claim of prosecutorial misconduct.

I.     **The Trial Court Did Not Violate Defendant's Right of Confrontation When it Admitted Evidence Seized From Defendant's Car Without Defendant Having an Opportunity to Confront the Officers Who Prepared and Executed the Search Warrant**

**{11}** Defendant argues that his Sixth Amendment right to be confronted with the witnesses against him was violated when the State presented physical evidence seized from his car

---

[1]The State called Chandler to testify at trial; however, Chandler was an uncooperative witness and informed the jury that he subscribed to the "code" that ex-convicts, like himself, do not testify in criminal cases.

without calling certain witnesses. The central thrust of Defendant's argument on appeal is that he had the right to confront officers that searched his car and the officer that arrested him. Absent such opportunity, Defendant contends, the district court erred by denying his motion to suppress evidence, including the ammunition recovered from his car. Defendant also makes a perfunctory argument that his right of confrontation was violated because the officer who prepared the search warrant for his car was not present at trial. Defendant misunderstands the scope of the Confrontation Clause, and we take this opportunity to address evidence and testimony to which it does not apply.

{12} The Sixth Amendment's Confrontation Clause entitles a criminal defendant to "be confronted with the witnesses against him[.]" U.S. Const. amend. VI. Challenges under the Confrontation Clause must be resolved as a matter of law, which we review de novo. *See State v. Huettl*, 2013-NMCA-038, ¶ 16, 305 P.3d 956. The Confrontation Clause "prohibits the introduction of testimonial hearsay unless the accused has had the opportunity to cross-examine the declarant." *State v. Carmona*, 2016-NMCA-050, ¶ 15, 371 P.3d 1056 (citing *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). It "applies to witnesses against the accused who provide testimony for the purpose of establishing or proving some fact." *Huettl*, 2013-NMCA-038, ¶ 16. "[A] person is a witness for Confrontation Clause purposes when that person's statements go to an issue of guilt or innocence." *State v. Aragon*, 2010-NMSC-008, ¶ 8, 147 N.M. 474, 225 P.3d 1280, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. "Testimonial statements" include those that convey information about evidence that was gathered after an "emergency has been resolved and the police have turned their attention to collecting evidence for use in a criminal prosecution against a known criminal perpetrator." *Carmona*, 2016-NMCA-050, ¶¶ 17, 19. "[B]asis evidence," which includes out-of-court-statements that form the basis for a testifying witness's conclusion, whether expert or lay, is testimonial and "therefore must be subjected to Confrontation Clause scrutiny." *Id.* ¶ 37; *see also State v. Navarette*, 2013-NMSC-003, ¶¶ 13-14, 294 P.3d 435 (discussing *Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221 (2012)). However, where a witness testifies from personal knowledge and neither makes a statement nor draws a conclusion that is based on hearsay, the Confrontation Clause is not implicated at all. *See Crawford*, 541 U.S. at 51-52 (holding that the Confrontation Clause is intended to bar the admission of testimonial hearsay); *United States v. Ibarra-Diaz*, 805 F.3d 908, 919-20 (10th Cir. 2015) (explaining that testimony that communicates no hearsay "is generally of no concern to the Confrontation Clause").

{13} We apply these principles to Defendant's argument that the district court erred by admitting evidence seized from Defendant's car when Defendant did not have the opportunity to confront particular officers involved in the seizure and his arrest.[2] Atypically

---

[2]We cannot help but observe that Defendant's own missteps in preparing for trial are what actually deprived him of an opportunity to confront the officers he wished to question. On the morning of trial, Defendant told the trial judge that he had attempted to subpoena certain officers whom he wished to call as witnesses. But Defendant—acting pro se with

given our consideration of the merits of the issue on appeal, Defendant did not contemporaneously object to the admission of either State's Exhibit 34, the forty-five rounds of bullets, or State's Exhibit 35, the black bag in which the ammunition was found. Rather, after the evidence had been admitted and after the State rested, standby counsel moved to suppress Exhibits 34 and 35, arguing that the State had failed to lay the proper foundation for their discovery and seizure. Standby counsel also argued that the State had failed to present evidence regarding the evidence's chain of custody. The district court denied Defendant's motion to suppress, which it considered a right-of-confrontation challenge.[3] The district court relied on *State v. Lopez*, 2013-NMSC-047, ¶ 26, 314 P.3d 236 (holding that the Sixth Amendment right of confrontation does not apply in pretrial hearings) to reach its decision. While we believe the district court's reliance on *Lopez* was misplaced, as we explain below, we agree with the conclusion reached and affirm on other grounds. *See State v. Ruiz*, 2007-NMCA-014, ¶ 38, 141 N.M. 53, 150 P.3d 1003 (explaining that as a general rule, we will uphold the decision of a district court if it is right for any reason).

**{14}** On appeal, Defendant asserts, without providing support from the record, that the testifying officers "would have had to rely on the out-of-court testimonial hearsay statements of the officer who signed the affidavit and conducted the search and the officer who arrested [Defendant]." Defendant thus appears to argue that the testifying officers offered improper, testimonial "basis evidence" regarding the origin of the ammunition. We disagree.

**{15}** In *Carmona*, this Court held that an expert's testimony stating that the defendant's DNA was found on swabs taken from the victim was inadmissible because it violated the Confrontation Clause. 2016-NMCA-050, ¶ 37. In that case, the state argued that its expert relied on the swabs themselves, not on the unavailable Sexual Assault Nurse Examiner's hearsay statement that the swabs were taken from the victim, to reach her conclusion. We

---

standby counsel—had failed to do so properly. We also note that Defendant was fully warned about the challenges of representing himself but chose to proceed pro se anyway. *See Newsome v. Farer*, 1985-NMSC-096, ¶ 18, 103 N.M. 415, 708 P.2d 327 (explaining that "a pro se litigant, having chosen to represent himself, is held to the same standard of conduct and compliance with court rules, procedures, and orders as are members of the bar" (emphasis omitted)).

[3]Given the absence of timely objection by Defendant to the admission of the complained-of evidence and Defendant's failure to directly evoke the Confrontation Clause as the basis for his motion to suppress, we could conclude that this issue simply was not preserved, in which case we would review for fundamental error only. *See State v. Dietrich*, 2009-NMCA-031, ¶ 51, 145 N.M. 733, 204 P.3d 748 (providing that preserved *Crawford* Confrontation issues are analyzed under a harmless error standard, while un-preserved *Crawford* issues are reviewed for fundamental error only). However, because Defendant is pro se and the question presented is of constitutional magnitude, we exercise our prerogative to directly address the issue presented.

rejected the state's argument, reasoning that the swabs, and particularly the information accompanying them, were utilized to establish or prove facts that "reflect[ed] directly on [the d]efendant's guilt or innocence[,]" *id.* ¶ 38 (internal quotation marks, and citation omitted), thus making statements regarding the circumstances of their use testimonial. Because the expert had based her opinion on an unavailable witness's testimonial hearsay (i.e., that the swabs were taken from the victim and from specific locations on her body), we concluded that the defendant's right of confrontation was violated when he was deprived of an opportunity to cross-examine the person who collected the evidence. *Id.* ¶ 42.

**{16}**    The pertinent testimony in this case is distinguishable from *Carmona*. Stella Carbajal, the evidence custodian and crime scene technician with the Las Cruces Police Department who was called to the incident at the Arid Club, was the only witness who testified regarding acquisition of the complained-of evidence. Although not one of the sworn police officers involved in the search, Ms. Carbajal's testimony was eventful: she personally collected evidence from Defendant's vehicle, including State's Exhibits 34 and 35. She likewise testified regarding the procedures used to ensure the evidentiary chain of custody and verified that State's Exhibits 34 and 35 were in the same condition as when she collected the evidence.

**{17}**    Unlike in *Carmona*, where the defendant was denied the opportunity to cross-examine the person who collected and documented the DNA swabs from the victim, here, Defendant had, and indeed exercised, the opportunity to confront Ms. Carbajal regarding her collection and handling of the evidence in question. Defendant asked about how and where Ms. Carbajal photographed the black AARP bag that contained the forty-five bullets. He asked whether she moved that evidence. Ms. Carbajal verified for Defendant that the bag containing the ammunition was in the car when the search began and that the 45 bullets were found there. Our review of Ms. Carbajal's testimony reveals that she offered no testimonial hearsay regarding the origin or seizure of the ammunition or any other item of evidence from Defendant's car.

**{18}**    What Defendant really seems to challenge on appeal is the fact that he did not have an opportunity to confront the additional officers who "conducted the search" of his car in order to explore a speculative theory that the bullets were planted in his car. Insofar as Defendant complains that the chain of custody for admitting the evidence is deficient, which is how he presented his argument to the district court, we reject this argument. "The admission of real or demonstrative evidence does not require the [s]tate to establish the chain of custody in sufficient detail to exclude all possibility of tampering." *State v. Rodriguez*, 2009-NMCA-090, ¶ 24, 146 N.M. 824, 215 P.3d 762. "Admission of evidence is within the district court's discretion and there is no abuse of discretion when the evidence is shown by a preponderance of the evidence to be what it purports to be." *Id.* Defendant concedes that Ms. Carbajal "was present and took pictures" of the evidence found in his car but infers that her testimony fails because she "is not a law enforcement officer[,]" a legal proposition for which he fails to provide authority or support. Defendant's claim that "[t]he trial court admitted evidence seized by officers not present at trial and therefore violated [Defendant's]

right to confrontation" ignores the fact that Ms. Carbajal, while not a sworn officer but rather the evidence technician that actually seized the evidence from Defendant's car, was qualified as a fact witness to testify regarding the origin of the evidence. We cannot say that the district court abused its discretion in admitting the bullets and the bag, which contained them, into evidence given that Ms. Carbajal testified and was subjected to cross examination regarding the evidence she collected.

**{19}**     With respect to the State's other witnesses, Defendant argues that "[t]he two officers who testified at trial did not witness the search and could not have possibly known that the bullets were seized from [Defendant's] car." But Defendant fails to demonstrate that either officer made any statement regarding the ammunition specifically found in Defendant's car. Our review of the record leads us to conclude that Defendant points to no specific examples of testimonial hearsay statements about the complained-of evidence because none exist.

**{20}**     Officer Savage, the K-9 officer who was involved in the actual apprehension of Defendant, did not testify at all regarding the ammunition found in Defendant's car. And while Detective Downs testified that he assisted with the post-arrest search and in securing evidence, and saw the ammunition that was found in the case,[4] he did not testify that the ammunition was seized from Defendant's car, suggest that he had personal knowledge of that fact, or rely on testimonial hearsay regarding that fact. *See Crawford*, 541 U.S. at 51-52 (holding that the Confrontation Clause is intended to bar the admission of testimonial hearsay); *Ibarra-Diaz*, 805 F.3d at 919-20 (explaining that testimony that communicates no hearsay "is generally of no concern to the Confrontation Clause").

**{21}**     We conclude that Defendant's Sixth Amendment right to confront the witnesses against him was not violated because no witness's testimony included testimonial hearsay. The district court did not err by denying Defendant's motion to suppress State's Exhibits 34 and 35.

## II.     Sufficiency of the Evidence to Sustain Defendant's Two Convictions

**{22}**     Defendant argues that the State failed to present sufficient evidence to sustain his convictions for resisting, evading, or obstructing an officer and for being a felon in possession of a firearm. We agree that there was insufficient evidence to convict Defendant of fleeing, evading, or attempting to evade a peace officer, but we disagree with respect to the felon-in-possession of a firearm charge.

### A.     Standard of Review

---

[4]While the record is not clear as to whether Detective Downs specifically participated in the search of the car and was personally involved in seizing the ammunition from Defendant's car, Defendant had the opportunity to confront this witness but failed to explore the matter on cross examination.

7

**{23}** "To determine whether the evidence presented was sufficient to sustain the verdict, we must decide whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Brietag*, 1989-NMCA-019, ¶ 9, 108 N.M. 368, 772 P.2d 898. We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "We do not reweigh the evidence and may not substitute our judgment for that of the fact finder, so long as there is sufficient evidence to support the verdict." *Brietag*, 1989-NMCA-019, ¶ 9. "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

**B.      There Was Insufficient Evidence For the Jury to Convict Defendant of Resisting, Evading, or Obstructing an Officer in Violation of Section 30-22-1(B)**

**{24}** For reasons that are not clear, the State elected to charge, and the grand jury indicted, Defendant under Subsection (B) of Section 30-22-1. Subsection (B) defines "[r]esisting, evading[,] or obstructing an officer" as consisting of "intentionally fleeing, attempting to evade[,] or evading an officer of this state when the person committing the act of fleeing, attempting to evade[,] or evasion has knowledge that the officer is attempting to apprehend or arrest him[.]" Section 30-22-1(B). The State opted not to charge Defendant under Subsection (D), which defines the prohibited conduct as consisting of "resisting or abusing any judge, magistrate[,] or peace officer in the lawful discharge of his duties." Section 30-22-1(D). As we explain below, our reading of Section 30-22-1 as a whole leads us to conclude that the State lacked sufficient evidence to convict Defendant under Subsection (B).

**{25}** Our Legislature chose to differentiate the manner by which a defendant can violate Section 30-22-1 by employing language indicative of action, related to flight from arrest, and separate language that involves immediate interaction between a subject and an arresting officer when the subject is non-compliant with being arrested. *Compare* § 30-22-1(B), *with* § 30-22-1(D). Regarding the language chosen by the Legislature, rules of statutory construction require that we "construe the entire statute as a whole so that all the provisions will be considered in relation to one another." *Am. Fed'n of State, Cnty. & Mun. Emps. (AFSCME) v. City of Albuquerque*, 2013-NMCA-063, ¶ 5, 304 P.3d 443 (internal quotation marks and citation omitted). Furthermore, we construe statutes "so that no part of the statute is rendered surplusage or superfluous[.]" *Id.* (internal quotation marks and citation omitted). Therefore, the Legislature's use of the term "evading" in the title and body of the statute, as well as its inclusion of a provision that makes "intentionally fleeing, attempting to evade[,] or evading an officer" a distinguishable crime under Section 30-22-1(B), is significant and, we must assume, not mere surplusage.

**{26}** In previously interpreting this statute, we explained that "[t]he crime of resisting,

8

evading[,] or obstructing an officer as set forth in Section 30-22-1, contains several alternative means by which the offense may be committed." *State v. Hamilton*, 1988-NMCA-023, ¶ 14, 107 N.M. 186, 754 P.2d 857. "A defendant's act of fleeing, attempting to evade[,] or evading an officer constitutes one of the alternative methods of committing the offense proscribed under Section 30-22-1." *Id.*; *see* § 30-22-1(B). Another distinct way of violating the statute is by "resisting or abusing" an officer. Section 30-22-1(D).

**{27}** There is nothing to prevent the State from charging a defendant under multiple subsections if it is not clear which charge the evidence will ultimately support. *See Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 24, 350 P.3d 1234 (illustrating that it is possible to charge both fleeing and resisting in violation of Section 30-22-1); *State v. Padilla*, 2006-NMCA-107, ¶ 25, 140 N.M. 333, 142 P.3d 921 (explaining that the resisting/evading instruction that the jury received allowed the jury to convict under either "fled, attempted to evade[,] or evaded" or the "resisted or abused" alternative), *rev'd on other grounds by* 2008-NMSC-006, 143 N.M. 310, 176 P.3d 299. "[T]he prosecutor is free to select the statute and the charges to be brought against [a d]efendant." *State v. Archie*, 1997-NMCA-058, ¶ 11, 123 N.M. 503, 943 P.2d 537. However, where a statute provides distinct and alternative offenses and the state chooses to charge under only a particular part of the statute, "the prosecution is limited to proving what it has charged." *State v. Leal*, 1986-NMCA-075, ¶ 14, 104 N.M. 506, 723 P.2d 977. Additionally, in order to convict, the state must present sufficient evidence of "guilt beyond a reasonable doubt *with respect to every element essential to a conviction.*" *State v. Carter*, 1979-NMCA-117, ¶ 6, 93 N.M. 500, 601 P.2d 733 (emphasis added).

**{28}** Our uniform jury instructions reinforce the structure of Section 30-22-1 and our conclusion that a violation of one subsection cannot necessarily establish a violation of another. UJI 14-2215 NMRA contains four elements that the State must prove in order to establish violation of Section 30-22-1. Three of the elements are common to all cases, regardless of which of the "alternative methods" the state alleges a defendant used to violate the statute. The State must prove the first, second, and fourth elements contained in UJI 14-2215 in every case. *See* UJI 14-2215 ("[T]he state must prove . . . each of the following elements of the crime[.]"). Those common elements are that (1) the person being resisted, evaded, or obstructed was a peace officer, judge, or magistrate in the lawful discharge of duty; (2) the defendant knew that the person was a peace office, judge, or magistrate; and (3) the incident in question happened in New Mexico on or about a particular date. *Id.*

**{29}** Also under UJI 14-2215, one of four alternative actions must be proven to satisfy the third element of the offense. *See* UJI 14-2215, Use Note 3 ("Use only the applicable alternative."). *See Benavidez*, 2015-NMCA-065, ¶ 24 (confirming that a defendant can be charged under multiple subsections of the statute; in such a case, multiple applicable alternatives for the third element of UJI 14-2215 would be given, as appropriate). The four alternatives for the third element correspond to the four subsections of Section 30-22-1. Thus, when the state charges a defendant under Subsection (B) of Section 30-22-1, it would have to prove the second alternative—that "[t]he defendant . . . fled, attempted to evade[,]

or evaded (*name of officer*)"; whereas when the state charges under Subsection (D), it must prove the fourth alternative—that "[t]he defendant resisted or abused (*name of officer*)[.]" UJI 14-2215.

**{30}**     In this case, the district court instructed the jury on the essential elements of "resisting, evading, or obstructing an officer" in the following manner:

> For you to find [D]efendant guilty of resisting, evading[,] or obstructing an officer as charged in Count 2, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.     [Detective] Downs or [Officer] Savage was a peace officer in the lawful discharge of duty;
>
> 2.     [D]efendant knew Wallace Downs or Joshua Savage was a peace officer[;]
>
> 3.     [D]efendant, with the knowledge that Wallace Downs or Joshua Savage was attempting to apprehend or arrest [D]efendant, *fled*, attempted to evade[,] *or evaded* Wallace Downs or Joshua Savage; and
>
> 4.     This happened in New Mexico on or about the 25th day of February, 2012.

(Emphasis added.) This instruction was consistent with the way Defendant was charged in the grand jury indictment, and the third element was the appropriate alternative to give in light of Defendant being specifically charged under Subsection (B) of the statute. *See Leal*, 1986-NMCA-075, ¶ 15 ("A defendant may not be convicted of a crime for which he was not charged or tried."). The question is whether the State presented evidence to prove the third essential element: that Defendant "fled, attempted to evade[,] or evaded" Detective Downs or Officer Savage before they were able to arrest him.

**{31}**     Defendant argues that the ordinary meaning of "evade" is "to stay away from someone or something or to slip away." The State urges us to define "evade" as "to avoid doing (something required)." Because the term "evade" is susceptible of multiple meanings, as evidenced by the parties' competing definitions that they urge us to adopt, we turn to rules of statutory construction to determine how the Legislature intended to define "evade" in Section 30-22-1. *See Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) (explaining that rules of statutory construction "have no place . . . except in the domain of ambiguity").

**{32}**     A "plain meaning" analysis is not appropriate here because of the facial ambiguity of the term "evade." *See Padilla*, 2008-NMSC-006, ¶ 7 ("If the language of the statute is

10

doubtful[ or] ambiguous . . . the court should reject the plain meaning rule in favor of construing the statute according to its obvious spirit or reason." (internal quotation marks and citation omitted)). Therefore, we start by applying the interpretive maxim of *noscitur a sociis*, which expresses the notion that "a word may be known by the company it keeps." *Russell Motor Car Co.*, 261 U.S. at 519.

**{33}** "The maxim *noscitur a sociis* applies and confines the word to a meaning kindred to that of the words with which it is associated." *City of Albuquerque v. Middle Rio Grande Conservancy Dist.*, 1941-NMSC-021, ¶ 33, 45 N.M. 313, 115 P.2d 66 (Salder, J., dissenting). This canon of statutory construction instructs that, when interpreting an unclear or ambiguous term within a statute, we "look[] to the neighboring words in a statute to construe the contextual meaning of a particular word in the statute." *In re Gabriel M.*, 2002-NMCA-047, ¶ 19, 132 N.M. 124, 45 P.3d 64; *see United States v. Williams*, 553 U.S. 285, 294 (2008) (explaining that words that are "susceptible of multiple and wide-ranging meanings" can be "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated").

**{34}** In this case, Subsection (B) of Section 30-22-1 associates "attempting to evade or evading" with "fleeing." We think the fact that these terms are collocated within the same subsection evinces the Legislature's intent to liken an act of evasion or attempted evasion to fleeing. "Flee" as a transitive verb, as it is used in Section 30-22-1, is commonly defined as "to run away from." *Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/flee (last visited on Dec. 9, 2016). Reading "evade" and "flee" as kindred terms leads us to conclude that the Legislature intended that "evade" be understood by the common definition that most closely connects "evade" to "flee." We believe the correct way to define the term "evade" as used in Section 30-22-1 is as meaning "to elude by dexterity or stratagem" or, more simply, "to be elusive to[.]" *Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/evade (last visited on Dec. 9, 2016). This definition of "evade" most closely parallels our understanding of the term "flee" as meaning "to run away from" because it shares the common characteristic of connoting the stealing away of oneself by affirmative, intentional conduct.

**{35}** In order, however, to not render "evade" mere surplusage, we note that these terms, while associated, are not identical or synonymous. What distinguishes them is the nature of the conduct and how evasion is achieved: "flee" being conduct that is open and obvious, and "evade" including conduct that is surreptitious. *See State v. Gutierrez*, 2005-NMCA-093, ¶ 20, 138 N.M. 147, 117 P.3d 953 (evaluating circumstances where an officer asked the defendant to stop, the defendant ignored the officer, went inside a house claiming that he needed to use the bathroom, walked out the back door of the house, then jumped over a backyard fence), *aff'd in part, rev'd in part on other grounds by* 2007-NMSC-033, 142 N.M. 1, 162 P.3d 156. In *Gutierrez*, we described a charge under Section 30-22-1(B) as being "evading and eluding." 2005-NMCA-093, ¶ 20. While the statute does not use the term "elude," *Gutierrez*'s interpretation of the term "evade" to also mean "elude" is an

11

interpretation that too is consistent with flight.

{36}    We cannot say the same about equating "evade" with "avoid." While we acknowledge that the State correctly points to one definition of "evade" as being "to avoid doing (something required)", *see Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/evade (last visited on Dec. 9, 2016), we conclude that this is not the definition that the Legislature intended to be used in the context of Section 30-22-1(B). While one who "evades" or "eludes" is necessarily also avoiding, the inverse is not true. One can avoid (doing something required) without necessarily evading or eluding. The Legislature made "evade" the "linguistic neighbor," *Bullock v. BankChampaign, N.A.*, ___ U.S. ___, ___, 133 S. Ct. 1754, 1760 (2013), of "flee" in subsection (B), which means we are to give "evade" the meaning that most closely and logically associates it with its neighbor, "flee."

{37}    This interpretation is consistent with our cases that construe Subsection (B). What all of our Subsection (B) cases have in common is that the defendant's conduct that supported conviction under Subsection (B) involved an affirmative physical act to move and/or stay away from an officer in order to avoid capture altogether (i.e., fleeing or evading), rather than the mere forestallment of being arrested (i.e., resisting or refusing to comply with commands to surrender). *See, e.g.*, *State v. Akers*, 2010-NMCA-103, ¶¶ 1, 9-10, 149 N.M. 53, 243 P.3d 757 (describing a situation where the defendant, after briefly stopping his truck for officers who were attempting an investigatory stop, sped away and was later charged under Subsection (B)); *Gutierrez*, 2005-NMCA-093, ¶ 20, (describing circumstances where an officer asked the defendant to stop, the defendant ignored the officer, went inside a house claiming that he needed to use the bathroom, walked out the back door of the house, then jumped over a backyard fence); *State v. Diaz*, 1995-NMCA-137, ¶ 17, 121 N.M. 28, 908 P.2d 258 (explaining that "evidence that [the d]efendant was backing away from the officers . . . would have supported a finding that [the d]efendant was . . . attempting to evade arrest in violation of Section 30-22-1(B)"); *State v. Andazola*, 1981-NMCA-002, ¶¶ 3-5, 95 N.M. 430, 622 P.2d 1050 (evaluating facts where the defendant walked away from the police, went into his house, and used his dog to keep police at bay). We believe these cases make clear that, in order to violate Section 30-22-1(B), a defendant must engage in conduct that is tantamount to fleeing, which, as the language of Subsection (B) suggests, can be accomplished either openly (e.g., by running or driving away from an officer, or "fleeing"), or surreptitiously (i.e., by "evading" or "attempting to evade").

{38}    By contrast, our cases that deal with Subsection (D)—"resisting or abusing"—make it clear that violations of Subsection (D) differ from Subsection (B) violations in that a defendant's violation is predicated on a direct engagement with, rather than evasion of an officer. *See State v. Cotton*, 2011-NMCA-096, ¶ 23, 150 N.M. 583, 263 P.3d 925 (describing the defendant's conduct that resulted in his being charged under Subsection (D) as kicking at officers who were trying to place him in police car and positioning his legs and head to prevent the door from being closed); *Diaz*, 1995-NMCA-137, ¶ 14 (explaining that "[a]nyone who commits aggravated assault [on a police officer] . . . also commits resisting

12

in violation of [Section] 30-22-1(D)”); *State v. Padilla*, 1983-NMCA-096, ¶¶ 2, 9, 10, 101 N.M. 78, 68 P.2d 706 (holding that resisting an officer, such as by kicking the officer in the groin, is a lesser included offense of battery on a police officer).

**{39}** Our cases illustrate that another way a person can violate Subsection (D) is by avoiding doing something required, including refusing to comply with an officer's orders. *See, e.g.*, *Diaz*, 1995-NMCA-137, ¶¶ 4, 16-23 (providing that "resisting" refers not only to a defendant's overt physical act, but also to the failure to act when refusing to obey lawful police commands, such as dropping a weapon); *see also City of Roswell v. Smith*, 2006-NMCA-040, ¶ 5, 139 N.M. 381, 133 P.3d 271 (affirming the defendant's conviction under Roswell's "obstructing an officer" ordinance, Roswell, N.M., Code of Ordinances ch. 10, art. 1, § 10-48 (1999), which is equivalent to Section 30-22-1(A), (D), based on the defendant's refusal to leave a fast-food restaurant parking lot after being ordered to do so by an officer).[5] While it is true that one (and the State's preferred) definition of "evade" is "to avoid doing (something required)," these cases illustrate that our courts interpret a refusal to do something required as constituting "resisting" not "evading" an officer, which violates Subsection (D), not (B).

**{40}** In sum, understood temporally and geospatially, violations of Subsection (B) and Subsection (D) are distinguishable based on at what point in an encounter a defendant first begins to exhibit resistant conduct. A defendant who is not yet physically capable of being apprehended and who attempts to avoid apprehension by trying to evacuate himself from the presence of an officer is more likely to be in violation of Subsection (B). By contrast, a defendant who is effectively "cornered," i.e., whose apprehension is imminent, but who, nonetheless, chooses to challenge or forestall his arrest—either by physical battery, refusing to comply with orders, or verbally—violates Subsection (D).

**{41}** We turn, now, to the evidence in this case regarding Defendant's conviction under Count 2. The State relies exclusively on evidence related to the telephonic interaction between Defendant and Detective Downs to establish a violation of Section 30-22-1(B). Specifically, the State argues that Defendant's "refus[al] to comply" with Detective Downs' orders to surrender constituted evasion of Detective Downs. We disagree.

**{42}** Defendant's entire interaction with Detective Downs occurred via telephone and lasted somewhere between five and ten minutes, according to Defendant, and one hour, according to Detective Downs. Detective Downs testified that the reason his call with Defendant ended was that the battery in Defendant's phone died. Detective Downs further testified that, during the course of the call, Defendant agreed on perhaps two or three

---

[5]The State's reliance on *Smith* is perplexing and unavailing. The section of the Roswell Code under which the defendant was convicted, Section 10-48, parallels Section 30-22-1(D). The Roswell Code contains a separate section—Section 10-49—that criminalizes "eluding an officer" and contains, verbatim, the language of Section 30-22-1(B).

occasions to surrender to police. Although Defendant ultimately did not willingly surrender to police, we believe the fact that Defendant repeatedly agreed to surrender, coupled with his continued presence in the club, is evidence that he lacked the requisite intent to "flee, attempt to evade, or evade" Detective Downs under Subsection (B). While refusing to comply with Detective Downs' orders to surrender may have constituted "resisting" under our case law, *see Diaz*, 1995-NMCA-137, ¶¶ 4, 16-23, in this case we do not believe that this conduct alone was sufficient to convict Defendant as charged. And we reiterate that there was no evidence presented to suggest that Defendant surreptitiously tried to escape from the Arid Club, such as out the back or side door, in order to evade arrest. We conclude that there was insufficient evidence to convict Defendant of fleeing, evading, or attempting to evade Detective Downs.

**{43}** While the State acknowledges that the jury instructions allowed the jury to convict Defendant of Count 2 based on either his interaction with Detective Downs *or* Officer Savage, the State, in its briefing, points to no evidence related to Defendant's interactions with Officer Savage that would support conviction under Section 30-22-1(B). Our review of the record likewise indicates that the prosecutor, in her closing argument, focused on the fact that Detective Downs and Officer Savage "issued commands to [D]efendant" and that Defendant "didn't comply" to support a conviction under Count 2. Even viewed in the light most favorable to sustaining the jury's verdict, we are unable to identify facts that support a conviction for fleeing, evading, or attempting to evade Officer Savage.

**{44}** The record reflects that Officer Savage, a member of the Las Cruces Police Department's K-9 unit, entered the Arid Club after the SWAT team made contact with Defendant. Along with other officers, Officer Savage commanded Defendant to surrender. He directed Defendant also to put down the nunchucks, and Defendant complied. Defendant was then given conflicting orders, including to "get on the floor," on the one hand, and to "[co]me to us[,]" on the other hand. Defendant did not comply with either command. Officer Savage testified that "[e]ventually, very quickly a plan was put together for use of force. A bean bag shotgun along with the K-9 was going to be used to take the subject into custody." Defendant was first "engaged with several bean bag rounds in the legs" which were ineffective. Officer Savage's K-9 was then given an "apprehension command." After that, Defendant picked up a chair and threw it in the direction of the dog. The K-9 then "went in for an engagement[.]" Defendant was "kicking and striking at the dog as the SWAT team made entry and moved towards [Defendant]." In the process of Defendant being taken into custody, Officer Savage's dog bit Defendant and Defendant was tasered. All of this transpired in approximately five to eight minutes.

**{45}** Based on these facts, there is insufficient evidence to support a finding that Defendant "fled, attempted to evade, or evaded" Officer Savage. Defendant's actions more closely resemble conduct that we have previously stated constitutes "resisting" an officer in violation of Subsection (D). The act of throwing a chair, kicking, and striking at Officer Savage's K-9—an act of direct physical confrontation and engagement—is more similar to kicking at an officer while resisting being put in a police car like in *Cotton*. *See* 2011-

14

NMCA-096, ¶ 23. Additionally, quite the opposite of fleeing the officers (and the K-9), Defendant stayed exactly where he was and made no attempt to leave. With respect to refusing to comply with Officer Savage's commands that he surrender, again we have held that refusing to comply with an officer's order violates Section 30-22-1(D), resisting an officer. *See, e.g.*, *Diaz*, 1995-NMCA-137, ¶¶ 4, 16-23. We do not believe that Defendant's failure to follow Officer Savage's orders—particularly when Officer Savage conceded that Defendant was being given conflicting commands—constituted evasion or attempted evasion of Officer Savage.

**{46}** It matters not whether Defendant was "resisting" because he "feared for [his] life" and was defending himself as he claims, or because he was confused by the conflicting commands, or because he simply did not want to surrender. The burden was on the State to prove that Defendant "fled, attempted to evade, or evaded" Officer Savage. The State failed to carry its burden, and for that reason we reverse Defendant's conviction under Count 2 and remand for resentencing.

**C.      There Was Sufficient Evidence For the Jury to Convict Defendant of Being a Felon in Possession of a Firearm in Violation of Section 30-7-16**

**{47}** Because Defendant stipulated to being a convicted felon, the critical element that the State was required to prove in order for the jury to convict Defendant of violating Section 30-7-16(A) was that Defendant "possessed a firearm" on or about February 25, 2012. *See* UJI 14-701 NMRA.

**{48}** "Possession" may be actual or constructive. *See* UJI 14-130 NMRA. A person is in actual possession of a firearm when, "on the occasion in question, he knows what [the firearm] is, he knows it is on his person or in his presence[,] and he exercises control over it." UJI 14-130. Alternatively, the State may proceed on a theory of constructive possession, whereby it must prove that, "[e]ven if the [firearm] is not in [Defendant's] physical presence, . . . he knows what it is and where it is and he exercises control over it." *Id.* In the case of constructive possession, we "must be able to articulate a reasonable analysis that the fact-finder might have used to determine knowledge and control." *State v. Garcia*, 2005-NMSC-017, ¶ 13, 138 N.M. 1, 116 P.3d 72 (alteration, internal quotation marks, and citation omitted). Under either an actual possession or constructive possession theory, the two key elements the State must establish are knowledge and control. *See* UJI 14-130. The State must prove that the defendant knows of the "presence and character of the item possessed." *Garcia*, 2005-NMSC-017, ¶ 14 (internal quotation marks and citation omitted). Knowledge may be proved by circumstantial evidence, and the jury is permitted to draw a reasonable inference of knowledge. *Id.* ¶ 15. Control may also be established by drawing reasonable inferences from circumstantial evidence. *Id.* ¶¶ 20-22. A defendant's ability to exercise control over ammunition may give rise to an inference of control over a firearm that can utilize that ammunition. *Id.* ¶ 22.

**{49}** In this case, the State had sufficient evidence to proceed and secure a conviction

15

under the theory of either actual or constructive possession. A reasonable jury could have found that Defendant's possession of the firearm was established through the testimony of Detective Downs. Detective Downs testified on direct examination that Defendant told him that he was armed with a gun. Detective Downs further testified that Brandon Chandler, the volunteer who was working at the snack bar at the Arid Club on the date in question, told him over the phone that Defendant had a gun. If the jury chose to believe Detective Downs, his testimony was sufficient to prove beyond a reasonable doubt that Defendant had knowledge and control, and thereby possession of a gun on February 25, 2012.

{50}     There was additional evidence from which a reasonable jury could infer Defendant's possession of a firearm. Police recovered a handgun inside the club, sitting on a countertop within arm's reach of where Defendant admitted he had been sitting and just feet from where police apprehended Defendant. This was sufficient evidence to circumstantially establish Defendant's ability to exercise control over the gun. Police also recovered forty-five rounds of ammunition from inside the car that Defendant drove to the Arid Club on February 25, 2012. While the car belonged to Defendant's then-girlfriend, Defendant admitted that his girlfriend did not possess a firearm and would not have had any need for the ammunition that was found in the car.

{51}     Finally, Defendant seems to argue that there was insufficient evidence to link him, as opposed to someone else, to the gun found at the club because it was found on a counter in an area that was open to the public. As this Court recognized in *State v. Maes*, "[i]n non-exclusive access cases, the problem the [s]tate faces is the alternative inference that some other individual with access to the premises is responsible for the presence of the contraband." 2007-NMCA-089, ¶ 17, 142 N.M. 276, 164 P.3d 975. The problem lies in the fact that "[e]vidence equally consistent with two hypotheses tends to prove neither." *Herron v. State*, 1991-NMSC-012, ¶ 18, 111 N.M. 357, 805 P.2d 624. Yet here, no evidence exists to suggest that the gun belonged to or was possessed by anyone other than Defendant. Instead, Defendant testified that Brandon Chandler, the only other person in the club with him when police arrived on February 25, left the club before Defendant and did not place the gun police found on the counter. Furthermore, like in *Garcia*, 2005-NMSC-017, ¶ 22, where the court held that control over an ammunition clip gave rise to a fair inference of control over the gun in a non-exclusive access situation, here, police found ammunition in Defendant's car that both matched the ammunition found inside the club and was usable by the type of gun that Detective Downs testified that Defendant stated he was armed with. The jury was free to reject any inference Defendant offered that the gun was possessed by anyone other than himself.

{52}     Because "a reviewing court will not second-guess the jury's decision concerning the credibility of witnesses, reweigh the evidence, or substitute its judgment for that of the jury[,]" *State v. Lucero*, 1994-NMCA-129, ¶ 10, 118 N.M. 696, 884 P.2d 1175, we conclude that the State presented sufficient evidence from which the jury could reasonably infer that Defendant either actually or constructively possessed the .22-caliber handgun recovered from inside the club.

**III.    The Trial Court Did Not Fundamentally Err by Failing to Give a Portion of the Constructive Possession Jury Instruction**

**{53}**    Defendant argues that the district court committed fundamental error when it failed to include optional language from UJI 14-130, the definitional instruction for "possession." We disagree.

**{54}**    "The standard of review we apply to jury instructions depends on whether the issue has been preserved." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. "If the error has been preserved we review the instructions for reversible error." *Id.* If a party fails to "object to the jury instructions as given, . . . we only review for fundamental error." *Cunningham*, 2000-NMSC-009, ¶ 8. "Under both standards we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *Benally*, 2001-NMSC-033, ¶ 12. Because Defendant failed to object to the instructions given at trial, Defendant failed to preserve this issue, and we review for fundamental error only. *See State v. Varela*, 1999-NMSC-045, ¶ 11, 128 N.M. 454, 993 P.2d 1280 ("Ordinarily a defendant may not base a claim of error on instructions he or she requested or to which he or she made no objection. . . . [F]undamental error need not be preserved . . . [and] cannot be waived." (internal quotation marks and citations omitted)).

**{55}**    UJI 14-130 provides that "[a] person is in possession of (*name of object*) when, on the occasion in question, he knows what it is, he knows it is on his person or in his presence[,] and he exercises control over it." When the theory of possession is based on constructive possession, the instruction provides supplemental language that "*may* be used depending on the evidence." UJI 14-130, Use Note 2 (emphasis added). There are three statements that can be used to supplement the main possession instruction. The first deals with a situation where the object the defendant is accused of possessing is not in his physical presence, but where he nevertheless exercises control over it. UJI 14-130. The second deals with a situation where two or more people may be able to simultaneously constructively possess an object. *Id.* The third explains that "[a] person's presence in the vicinity of the object or his knowledge of the existence or the location of the object is not, by itself, possession." *Id.* In this case, the district court instructed the jury as follows with respect to the felon-in-possession charge:

> For you to find . . .[D]efendant guilty of possession of a firearm by a felon as charged in [C]ount 1, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.    [D]efendant possessed a firearm;
>
> 2.    [D]efendant, in the preceding ten years, was convicted and sentenced to one or more years imprisonment by a court of the United States or by a court of any state; and

17

3. This happened in New Mexico on or about the 25th day of February, 2012.

*See* UJI 14-701.

**{56}** In addition to this elemental instruction, the district court instructed the jury as follows with respect to the definition of "possession":

A person is in possession of a firearm when, on the occasion in question, he knows what it is, he knows it is on his person or in his presence[,] and he exercises control over it.

Even if the object is not in his physical presence, he is in possession if he knows what it is and where it is and he exercises control over it.

**{57}** The district court included the latter statement even though the evidence showed that Defendant was, in fact, in the physical presence of the gun. The district court, however, did not include the third supplemental statement regarding proximity to the object: "A person's presence in the vicinity of the object or his knowledge of the existence or the location of the object is not, by itself, possession." UJI 14-130. Defendant failed to object to the instruction, including the omission of the "proximity" statement, despite the court's express invitations to register any objections to proposed instructions and to submit competing instructions. Because Defendant failed to preserve the matter, we review for fundamental error only.

**{58}** We begin our review by noting that in *State v. Barber*, our Supreme Court held that it was not fundamental error to fail to give any part of the definitional instruction for possession. 2004-NMSC-019, ¶ 1, 135 N.M. 621, 92 P.3d 633. In *Barber*, like in this case, the defendant's trial counsel failed to request a jury instruction defining possession. *Barber* was a case dealing with possession of a controlled substance, in which case UJI 14-3130 NMRA rather than UJI 14-130 applies. *See* UJI 14-3130 comm. cmt. ("This instruction must be given if possession is in issue and its use replaces UJI 14-130 which should not be used in controlled substance cases."). However, for our purposes, this distinction does not matter because the instructions are, for all intents and purposes, identical, and the court's reasoning in *Barber* is what matters here.

**{59}** The *Barber* court explained that definitional instructions are not always essential, *see* 2004-NMSC-019, ¶ 25, and held that failing to give a definitional instruction was not fundamental error because "the missing definition of possession does not implicate a critical determination akin to a missing elements instruction[.]" *Id.* ¶ 26 (internal quotation marks and citation omitted). Notably, the definitional instruction at issue in *Barber* was mandatory in a case where possession was an issue, *see* UJI 14-3130 comm. cmt. ("[t]his instruction *must be given* if possession is in issue" (emphasis added)), whereas UJI 14-130 provides that the supplemental instructions are optional. *See* UJI 14-130, Use Note 2 ("One or more of the following bracketed sentences *may be used* depending on the evidence." (emphasis added)).

18

**{60}**     In a case such as this, "we must place all the facts and circumstances under close scrutiny to see whether the missing instruction caused such confusion that the jury could have convicted [the d]efendant based upon a deficient understanding of the legal meaning of possession as an essential element of the crime." *Barber*, 2004-NMSC-019, ¶ 25. Here, if the State had relied solely on Defendant's proximity to the gun found inside the club—i.e., the fact that the chair he was sitting in was directly in front of the gun that police found on the countertop inside the club—it may have been error to fail to give the "proximity" instruction because the jury may have been confused and erroneously equated "proximity" with "possession." However, the State presented other evidence unrelated to Defendant's physical proximity to the gun from which the jury could have reasonably concluded that Defendant possessed the gun. First, Detective Downs testified that Defendant told him over the phone that he was armed with a gun. Second, Detective Downs testified that Brandon Chandler stated to him over the phone that Defendant had a gun. From this evidence, the State could have proceeded on a theory of actual possession, in which case the trial court's failure to give a portion of the constructive possession definition was not error at all.

**{61}**     We also note that the district court's instruction properly informed the jury that, in order to convict Defendant of possession, it had to find both that he knew what the gun was and that he exercised control over it. The omitted instruction of which Defendant now complains does not add anything that was not already addressed by the main definitional instruction. To instruct the jury that "[a] person's presence in the vicinity of the object or his knowledge of the existence or the location of the object is not, by itself, possession[,]" UJI 14-130, simply restates what the main instruction provides: that one can only be found to be in possession of something if he both "knows" what the object is *and* "exercises control over it." *Id.* We are satisfied that, even under a constructive possession theory, it was not fundamental error for the district court to fail to provide the jury with the optional "proximity" language of UJI 14-130.

## IV.     The Trial Court Did Not Abuse Its Discretion by Allowing the State to Introduce Evidence of Defendant's Pending Lawsuit Against the City of Las Cruces

**{62}**     Defendant argues that the district court erred when it allowed the State to introduce the fact that Defendant has a pending lawsuit against the City of Las Cruces. While we find the State's responsive argument somewhat unpersuasive and the record scant as to the district court's justification for allowing the evidence, we hold that it was not an abuse of discretion and that, even assuming it was, any error in allowing evidence of Defendant's pending lawsuit was harmless.

**{63}**     We review decisions to admit or exclude evidence under an abuse of discretion standard. *See State v. Stampley*, 1999-NMSC-027, ¶ 37, 127 N.M. 426, 982 P.2d 477; *Garcia*, 2005 NMCA-042, ¶ 38. A trial court abuses its discretion "when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the [district] court abused its discretion by its ruling unless we can characterize [the ruling] as

19

clearly untenable or not justified by reason." *Rojo*, 1999-NMSC-001, ¶ 41 (internal quotation marks and citations omitted).

**{64}** At trial, the prosecutor's first question of Defendant on cross-examination was whether he had "filed some sort of lawsuit against the City of Las Cruces." After Defendant responded affirmatively and answered the prosecutor's next question about where the lawsuit was filed, standby counsel requested a bench conference where he made a relevancy-based objection to the prosecutor's questions about the lawsuit. The prosecutor responded, "[g]oes to bias, Your Honor. It's absolutely relevant if a witness has filed a lawsuit. It has a connection to the case." The district court overruled the objection but cautioned the prosecutor "not to belabor the point." After reestablishing that Defendant had filed a lawsuit against the City of Las Cruces related to the incident at the Arid Club, the prosecutor asked Defendant what kind of damages he was seeking. Defendant initially resisted answering and stated, "I feel . . . that has nothing to do with this case." After the trial judge instructed him to answer, Defendant began describing his claims, which included excessive force and false imprisonment, rather than the damages Defendant sought.[6] The district court stepped in to clarify the question and explained to Defendant that the prosecutor was asking him to state the amount of monetary damages he claimed to be appropriate in his civil suit. Defendant disclosed that he asked for eighty million dollars for his claims related to the February 25, 2012, incident. The prosecutor then moved on to a different line of impeachment questioning related to Defendant's criminal history.

**{65}** Defendant argues that evidence of his pending civil lawsuit related to the events of February 25, 2012, was not relevant to proving the charges against him and, therefore, was inadmissible. He further argues on appeal, though he did not preserve the argument at trial, that evidence of the lawsuit was "distracting to the jury, resulting in confusion of the issues and unfair prejudice." As already mentioned, the prosecutor's counterargument to Defendant's relevancy challenge at trial was simply that the evidence "[g]oes to bias." Once the evidence was admitted, the prosecutor used it to argue in closing that "[Defendant] has a bias because now he thinks he's going to get a big paycheck. Apparently, he thinks if he's not convicted, that will help his lawsuit." The prosecutor also told the jury, "you can factor that in to the sort of bias [Defendant] might have for the way that he testified here today."

**{66}** The State clarifies its argument on appeal as being that, because of the conflicting evidence with which the jury was presented, evidence of Defendant's lawsuit was "relevant for the purpose of assisting the jury in determining what actually happened at the Arid Club on February 25, 2012." The State reasons that the evidence would assist the jury with

---

[6]The State attempts to characterize Defendant's specific reference to the nature of his claims as having "opened the door to the subject matter of the litigation." We do not agree with the State's characterization. The record reflects that Defendant, in fact, resisted discussing the lawsuit and only went into details when instructed to do so by the district court.

"reconciling . . . competing narratives" and "would have been helpful to the jury's assessment of witness credibility[.]" Echoing the prosecutor's closing argument, the State also argues that "[h]ad [Defendant] successfully persuaded the jury that his version of the events in question was the more accurate one, he could have collected potent ammunition for use in his litigation against the City." While the State's broader arguments are unconvincing, we generally agree with the State that the evidence was admissible for the purpose of attacking Defendant's credibility.

**{67}** In order to be admissible, evidence must be relevant. Rule 11-402 NMRA; *see State v. Christopher*, 1980-NMSC-085, ¶ 12, 94 N.M. 648, 615 P.2d 263. "Evidence is relevant if [(a)] it has any tendency to make a fact more or less probable than it would be without the evidence, and [(b)] the fact is of consequence in determining the action." Rule 11-401 NMRA. "Any doubt whether the evidence is relevant should be resolved in favor of admissibility." *State v. Balderama*, 2004-NMSC-008, ¶ 23, 135 N.M. 329, 88 P.3d 845.

**{68}** "[W]hen a defendant testifies, he is subject, within the limits of certain rules, to cross-examination the same as any other witness." *State v. Gutierrez*, 2003-NMCA-077, ¶ 13, 133 N.M. 797, 70 P.3d 797. The general rule is that the "[s]tate has a right to inquire into and comment upon the credibility of the defendant as a witness." *State v. Hoxsie*, 1984-NMSC-027, ¶ 6, 101 N.M. 7, 677 P.2d 620, *overruled on other grounds by Gallegos v. Citizens Ins. Agency*, 1989-NMSC-055, ¶ 28, 108 N.M. 722, 779 P.2d 99. Credibility is "[t]he quality that makes something (as a witness or some evidence) worthy of belief." *Black's Law Dictionary* 448 (10th ed. 2014).

**{69}** Bias is widely recognized as being one way to attack the credibility of a witness. *See* 1 Kenneth S. Broun, *McCormick on Evidence* § 33 (7th ed. 2013). "Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel*, 469 U.S. 45, 52 (1984). A criminal defendant who testifies at trial is presumed to be biased and to have an interest in the outcome of the case. *See United States v. Dickens*, 775 F.2d 1056, 1059 (9th Cir. 1985) (explaining that, when a criminal defendant testifies at trial, "the defendant's bias in his own behalf [is] self-evident").[7] Bias may also be inferred from "a witness'[s] like, dislike, or fear of a party, *or by the witness'[s] self-interest*." *Abel*, 469 U.S. at 52 (emphasis added). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness'[s] testimony." *Id.*; *see also State v. Chambers*, 1986-NMCA-006, ¶ 15, 103 N.M. 784, 714 P.2d 588 ("Testimony concerning bias and credibility is always relevant.").

---

[7]In this case, the prosecutor acknowledged a criminal defendant's assumed bias when she argued in closing that Defendant, "also, of course, doesn't want to be convicted. That's a natural bias."

**{70}** Defendant, having chosen to testify, put his credibility in issue, making evidence related to his credibility relevant. The State used the evidence of Defendant's pending lawsuit to undermine his credibility by inferring that he had reason to be untruthful in his testimony based on what the State argued was his interest in getting "a big paycheck." Because Defendant testified to the events at the Arid Club on February 25, 2012, and because Defendant's testimony was relevant to establishing whether it was more or less probable that he committed the crimes with which he was charged, it was within the district court's discretion to allow the State to introduce evidence for the purpose of impeaching Defendant's testimony. We cannot say, as a matter of law, that the district court's decision to admit the evidence was "clearly untenable or not justified by reason." *Rojo*, 1999-NMSC-001, ¶ 41 (internal quotation marks and citation omitted). We, therefore, hold that the district court did not abuse its discretion in allowing limited testimony regarding Defendant's pending lawsuit as a way of attacking Defendant's credibility.

**{71}** As a final matter, we note that Defendant also argues, for the first time on appeal, that the evidence of his pending lawsuit should have been excluded under Rule 11-403 NMRA, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Because Defendant failed to timely object on this ground at trial, we will reverse on this basis only if we are "convinced that admission of the testimony constituted an injustice that creates grave doubts concerning the validity of the verdict." *State v. Barraza*, 1990-NMCA-026, ¶ 17, 110 N.M. 45, 791 P.2d 799; *see State v. Lucero*, 1993-NMSC-064, ¶¶ 12-13, 116 N.M. 450, 863 P.2d 1071 (explaining that appellate courts review un-preserved challenges to the admission of evidence for plain error—meaning error that "affected substantial rights although the plain errors were not brought to the attention of the judge" (alteration, internal quotation marks, and citation omitted)).

**{72}** Defendant argues that the evidence of his pending lawsuit was "highly prejudicial" because it tended to paint him as a "litigious person and tried to demonstrate to the jury that the only reason [Defendant] was fighting this case was because of a vendetta held against other governmental agencies and so that he could win a significant amount of money." Given the other evidence in this case that the jury could have relied on to convict Defendant—namely, the testimony of Detective Downs and the physical evidence the State presented—we are not persuaded that the admission of evidence of Defendant's pending lawsuit, even if unfair, confusing, and distracting, "constituted an injustice that creates grave doubts concerning the validity of the verdict." *Barraza*, 1990-NMCA-026, ¶ 17.

**{73}** We hold that it was neither an abuse of discretion nor plain error for the trial court to admit evidence of Defendant's pending lawsuit.

## V.    The State Did Not Commit Prosecutorial Misconduct

**{74}** Defendant argues that it was prosecutorial misconduct, rising to the level of

22

fundamental error for the prosecutor to (1) repeatedly mention Defendant's civil lawsuit, and (2) fail to call as witnesses the police officers who obtained the search warrant for Defendant's car and arrested Defendant. We disagree. Defendant failed to object at trial to conduct he now characterizes as prosecutorial misconduct; therefore, we will review Defendant's prosecutorial misconduct claims for fundamental error only. *See State v. Trujillo*, 2002-NMSC-005, ¶ 52, 131 N.M. 709, 42 P.3d 814.

**{75}** "Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728 (internal quotation marks and citation omitted). "To find fundamental error, we must be convinced that the prosecutor's conduct created a reasonable probability that the error was a significant factor in the jury's deliberation in relation to the rest of the evidence before them." *State v. Sosa*, 2009-NMSC-056, ¶ 35, 147 N.M. 351, 223 P.3d 348 (internal quotation marks and citations omitted). We will reverse a jury verdict only "(1) when guilt is so doubtful as to shock the conscience, or (2) when there has been an error in the process implicating the fundamental integrity of the judicial process." *Id.* "However, an isolated, minor impropriety ordinarily is not sufficient to warrant reversal, because a fair trial is not necessarily a perfect one." *State v. Garvin*, 2005-NMCA-107, ¶ 13, 138 N.M. 164, 117 P.3d 970 (alteration, internal quotation marks, and citation omitted).

**A.** **The Prosecutor's References to Defendant's Pending Lawsuit Against the City of Las Cruces Did Not Constitute Prosecutorial Misconduct**

**{76}** In assessing whether prosecutorial misconduct has occurred based on statements made by a prosecutor at trial, reviewing courts are to evaluate a prosecutor's challenged statements "objectively in the context of the prosecutor's broader argument and the trial as a whole." *Sosa*, 2009-NMSC-056, ¶ 26. We start from the long-accepted proposition that "[d]uring closing argument, both the prosecution and defense are permitted wide latitude, and the trial court has wide discretion in dealing with and controlling closing argument[.]" *State v. Smith*, 2001-NMSC-004, ¶ 38, 130 N.M. 117, 19 P.3d 254 (internal quotation marks and citations omitted). "[R]emarks by the prosecutor must be based upon the evidence or be in response to the defendant's argument." *Id.* "It is misconduct for a prosecutor to make prejudicial statements not supported by evidence." *State v. Duffy*, 1998-NMSC-014, ¶ 56, 126 N.M. 132, 967 P.2d 807, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, 275 P.3d 110. However, "[s]tatements having their basis in the evidence, together with reasonable inferences to be drawn therefrom, are permissible and do not warrant reversal." *State v. Herrera*, 1972-NMCA-068, ¶ 8, 84 N.M. 46, 499 P.2d 364 (internal quotation marks and citation omitted).

**{77}** Defendant argues that the prosecutor's repeated references to Defendant's pending civil litigation constituted misconduct because the litigation "had no bearing on the issues in this case[ and were] irrelevant and prejudicial." Defendant ignores the fact that the trial court overruled his relevancy-based objection to the introduction of evidence of Defendant's

pending lawsuit. The prosecutor's statements during closing and rebuttal were based on facts she had elicited from Defendant on cross-examination after standby counsel's objection was overruled. In closing, the prosecutor argued to the jury that Defendant "filed a lawsuit, thinks he's going to collect [eighty] million dollars." The prosecutor also argued that the jury should infer that Defendant "has a bias because now he thinks he's going to get a big paycheck." During rebuttal, she commented, "[D]efendant is the one with bias. [D]efendant is the one who thinks he's going to collect an [eighty] million dollar[] paycheck from the City of Las Cruces." Nothing in the prosecutor's comments during closing or rebuttal fell outside of already-admitted evidence or assumed facts not in evidence.

**{78}** Because the evidence referred to by the prosecutor had been admitted—whether erroneously or not—the prosecutor was free to comment on it. *Compare State v. Santillanes*, 1970-NMCA-003, ¶¶ 13-14, 81 N.M. 185, 464 P.2d 915 (explaining that the remarks of prosecutor during closing were not improper because they were based on facts in evidence), *with State v. Cummings*, 1953-NMSC-008, ¶ 8, 57 N.M. 36, 253 P.2d 321 (explaining that "a statement of facts *entirely outside of the evidence*, and highly prejudicial to the accused, cannot be justified as argument" (emphasis added)). We reject Defendant's claim that his conviction was tainted by prosecutorial misconduct.

### B.   The State Did Not Commit Prosecutorial Misconduct by Not Calling the Officers Involved in Securing the Search Warrant and Arresting Defendant

**{79}** Defendant argues that the prosecutor committed misconduct by failing to call necessary witnesses, specifically the officer who signed the affidavit for the search warrant for Defendant's car and the officer who arrested Defendant, whom Defendant argues he was entitled to cross examine. As this Court has explained, "[t]he decision to call or not call a witness is a matter of trial tactics and strategy within the control of counsel." *Maimona v. State*, 1971-NMCA-002, ¶ 11, 82 N.M. 281, 480 P.2d 171. For the same reasons that our courts have long held that defense counsel's failure to call witnesses is an insufficient basis for finding ineffective assistance of counsel, *see id.*, we reject Defendant's argument that the prosecutor's decision not to call certain witnesses constituted misconduct.

### CONCLUSION

**{80}** We hold that there was insufficient evidence to support Defendant's conviction for resisting, evading, or obstructing an officer under Count 2 of the indictment. We affirm Defendant's conviction for felon in possession of a firearm, reverse his conviction under Count 2, and remand for resentencing in accordance with this opinion.

**{81}   IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

24

**WE CONCUR:**

_____

**TIMOTHY L. GARCIA, Judge**


_____

**M. MONICA ZAMORA, Judge**